IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

TIMOTHY C. DILLON,

Plaintiff, CASE NO.:

vs.

PALM BEACH COUNTY SHERIFF'S OFFICE
(Ric Bradshaw, in his official
Capacity as Sheriff of Palm Beach County, Florida)
ELTON BUTLER, individually;
LAVONTE CHASTINE, Individually and
as Deputy with the Palm Beach County
Sheriff's Office; WILLIAM WHEELER,
Individually and as Deputy with the Palm Beach
County Sheriff's Office;
County Sheriff's Office; GEORGE McMAHON,
Individually and as Deputy with the Palm Beach
County Sheriff's Office; SAMUEL BLANCO,
Individually and as Deputy with the Palm Beach
County Sheriff's Office;

Defendants.
_______________________________________/

**COMPLAINT and JURY DEMAND**

Plaintiff, TIMOTHY C. DILLON, (hereinafter Plaintiff **"TIMOTHY"**) by and through undersigned counsel and hereby files this Complaint against PALM BEACH COUNTY SHERIFF'S OFFICE (Ric Bradshaw, in his official Capacity as Sheriff of Palm Beach County, Florida) (hereinafter Defendant "**PBSO"**), LAVONTE CHASTINE (hereinafter Defendant **"CHASTINE")**, WILLIAM WHEELER (hereinafter Defendant **"WHEELER")**, GEORGE McMAHON (hereinafter Defendant **"MCMAHON"**) and SAMUEL BLANCO (hereinafter Defendant **"BLANCO")** in their individual capacities and as Deputy Sheriffs with the Palm Beach County Sheriff's Office) and **ELTON BUTLER, LPN (**hereinafter Defendant **"BUTLER"**) and alleges as follows:

## **INTRODUCTION**

This civil action arises from an incident in the Palm Beach County Jail located at Gun Club Road, that occurred in the late morning hours of August 22, 2013.

TIMOTHY was arrested on August 18, 2013, after a five (5) hour standoff with PBSO deputies while suffering from a mental infirmity, disease or defect, and asked them to kill him, in a suicide by cop scenario. PBSO deputies shot TIMOTHY in the shoulder sparing his life but he ended up facing federal and state charges. After being shot, TIMOTHY was taken to the Delray Medical Center and treated. TIMOTHY was released from Delray Medical Center, on August 19, 2013, and taken to the PBC Jail at Gun Club Road.

At the PBSO Gun Club Jail, TIMOTHY was examined by the medical staff and found to have type II diabetes and arthritis in addition to his shoulder gun-shot wound. While in the care of the Palm Beach County Jail, his Delray Medical Center discharge documents clearly stated a final active medication list for which a man in TIMOTHY needed to follow. The active medications list was given so TIMOTHY could easily update his medical providers as to his medical conditions. PBSO and the Palm Beach County Jail medical team knew or should have known of these discharge documents and failed to follow these **explicit** directions by prescribing TIMOTHY additional medications of Valium and Ativan, two (2) drugs known to have additional CNS depressant effects when administered with other CNS depressants, such as Vicodin.

The medical staff at Palm Beach County Jail prescribed the additional medications and by recklessly and wantonly using benzodiazepines together,

TIMOTHY, suffered from excessive sedation, fatigue, drowsiness, muscle weakness and ataxia – a condition which left TIMOTHY with loss of control of bodily movements. This was in addition to the gun shot shoulder wound that TIMOTHY had sustained on August 17, 2013.

TIMOTHY may also have been suffering from psychiatric and paradoxical reactions to the multitude of sedating drugs causing bouts of restlessness, agitation, irritability, hallucinations, psychoses and inappropriate behavior and other adverse behavioral effects all of which were known or should have been known by the named Defendants.

On August 22, 2013, the wounded Plaintiff was taken in handcuffs from his jail cell at the Palm Beach County Jail at Gun Club Road, and underwent a mandatory “vitals” check examination at the Gun Club Jail medical infirmary by Nurse Nealy (who is the wife of PBSO D/S Cpl. Napolean Nealy). TIMOTHY was dazed, drugged, confused and suffering the side effects from the voluminous amounts of sedating drugs being administered to him by the medical staff at the Palm Beach County Jail. TIMOTHY DILLON was complacent, cooperative, and docile at all times on his way to the infirmary and while at the infirmary.

After being examined at the Gun Club Jail infirmary by Nurse Nealy, the handcuffed, drugged, and confused TIMOTHY was being escorted back to his cell from the infirmary, by PBSO Deputy CHASTINE. TIMOTHY took a wrong turn out of the infirmary and was heading in the wrong direction. The confused and handcuffed TIMOTHY was walking in the wrong direction when CHASTINE, who was walking behind TIMOTHY, was pointing for TIMOTHY to go in the other direction. TIMOTHY

could not see CHASTINE behind him pointing nor did he understand that he was going in the wrong direction. From behind, Deputy CHASTINE pulled the handcuffed TIMOTHY by his left bicep to go the other way. The dazed, drugged, and confused TIMOTHY did not understand what was happening. There was an exchange of words between TIMOTHY and CHASTINE. At no time did the handcuffed TIMOTHY make any aggressive move or pose any risk of physical harm to Deputy CHASTINE or anyone nearby, although he was walking in the wrong direction.

An overzealous Deputy CHASTINE, exhibiting a wanton and willful disregard of human rights and safety, took this opportunity to grab TIMOTHYs shirt collar with one hand and grabbed TIMOTHYS left bicep with his other hand and then forcefully pulled the handcuffed and wounded TIMOTHY to the ground. After throwing TIMOTHY to the ground, Deputy CHASTINE threw his left knee into TIMOTHY'S back, placed his right hand on the back of TIMOTHY's neck, his hand almost around TIMOTHY'S throat, and placed his full body weight on top of the handcuffed, TIMOTHY.

TIMOTHY, who had no idea what was happening to him as he was lying face down on the floor, was gasping for air as he could exhale, but not inhale with Deputy CHASTINE's left knee in his back, CHASTINE's right hand on the back of TIMOTHY's neck, wrapping his hand close to TIMOTHY'S throat, and CHASTINE's full body weight on top of him. In an act of self-preservation as he was gasping for air, TIMOTHY started to kick his legs. At this point in time Defendant **ELTON BUTLER,** a LPN, who was walking behind both CHASTINE and TIMOTHY, failed to recognize

TIMOTHY’S distress and instead jumped onto the face down and prone TIMOTHY and grabbed his legs. BUTLER’s actions hindered TIMOTHY’s attempts to breath.

As the handcuffed TIMOTHY was being forcibly held face down and restrained by both BUTLER and CHASTINE, he was still struggling to breathe. Nurse WHEATLEY joined CHASTINE and BUTLER and also grabbed TIMOTHYS legs as he was struggling to breath. Then D/S NEALY placed leg restraints on the prone TIMOTHY. At that time Deputy WHEELER arrived. Deputy WHEELER exhibiting a wanton and willful disregard of human rights and safety, held down TIMOTHYS neck with his hand, and then placed his knee and leg into the back of TIMOTHY, insuring that TIMOTHY could not draw another breath as there were now two deputies whose knees were in TIMOTHY’S’ back.

In addition, D/s MCMAHON exhibiting a wanton and willful disregard of human rights and safety, took this opportunity to also jump on top of the helpless TIMOTHY, and placed his left hand on TIMOTHYs shoulder, and placed his right hand on the lower part of TIMOTHYS back. Then MCMAHON placed his left knee on TIMOTHYS lower back, thus reassuring that the helpless TIMOTHY could not breath, as there were then three (3) men with their knees in his back.

In short order D/S BLANCO exhibiting a wanton and willful disregard of human rights and safety, took this opportunity to join the fray as he saw TIMOTHY, in one last desperate attempt to live and breathe, trying to get his upper body off of the ground so he could draw a breath. In an effort to assist WHEELER and all the others in denying TIMOTHY the chance to raise up his upper torso up just to breathe,

BLANCO used his right hand to slam TIMOTHYS shoulder back to the ground, thus insuring TIMOTHY would stop breathing, which he did.

Despite the fact that TIMOTHY stopped breathing and stopped moving and as he laid handcuffed prone on the floor, there were still at least five (5) men on top of him and/or pressing on his body. BUTLER, who was still had a hold on the now not breathing TIMOTHY was the first to notice that TIMOTHY's face was blue and called for medical assistance. At that time, a doctor and remaining medical staff at the jail came to aid the "blue" and not breathing TIMOTHY DILLON.

The above described actions of the Defendants exhibited a wanton and willful disregard of human rights and safety, as the handcuffed TIMOTHY had stopped breathing for a matter of minutes as he was being held down and restrained by at least five (5) grown men, despite truing blue and no longer struggling to breathe. TIMOTHY's body had lapsed into a seizure, went into a coma, and he had to be resuscitated. Fortunately, TIMOTHY, lived thought this jailhouse ordeal, but has sustained severe brain injuries and neurological damages.

## JURISDICTIONAL STATEMENT

1. This is an action brought pursuant to Florida common law, 42 U.S.C. §1983, and arising out of the Fourth and Fourteenth Amendment to the United States Constitution, including compensatory damages, punitive damages, costs and attorney fees pursuant to 42 U.S. C §1988.

2. This Court has original federal question jurisdiction over these actions based on 28 U.S.C. §§1331. The court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S. C. §1367(a)

## IDENTIFICATION OF PARTIES

3. Plaintiff, TIMOTHY DILLON, is a resident of the City of Breckenridge, Breckenridge County, Colorado and was a former prisoner at the Palm Beach County Jail at Gun Club Road.

4. PALM BEACH COUNTY SHERIFF's OFFICE (RIC BRADSHAW in his official capacity as Sheriff of Palm Beach County, Florida) is authorized by the laws of the State of Florida to operate the Palm Beach County Jail. As part of its responsibilities and services, Palm Beach County also operates a law enforcement agency, the Palm Beach County Sheriff's Office, that, among other duties, operates and controls the Palm Beach County jail system, including the Palm Beach County Jail at Gun Club Road. Defendant Palm Beach County Sheriff's Office Headquarters is located at 3228 Gun Club Road, West Palm Beach, Florida 33406, in Palm Beach County, Florida.

5. PALM BEACH COUNTY SHERIFF's OFFICE employed LAVONTE CHASTINE, WILLIAM WHEELER, GEORGE MCMAHON, SAMUEL BLANCO, as deputy sheriffs among other employees who, in the course and scope of their employment, were required to observe, watch over, protect and manage persons placed in custody within the Palm Beach County Jail System.

6. At all times material, hereto, **DEFENDANT CHASTINE,** was/is a resident of Palm Beach County and employed as certified law enforcement officer law enforcement officer by **Defendant, PBSO. CHASTINE,** is a "person" under 42 U.S.C. §1983 and at all times relevant to this case was acting under the direction and control of PBSO in such capacity as an agent, servant and employee of **PBSO**. **DEFENDANT CHASTINE**

participated in the unconstitutional violations and other wrongful acts that occurred in the morning hours of August 22, 2013 at which time he was within the course and scope of his employment under color of state law.

7. At all times material, hereto, **DEFENDANT WHEELER,** was/is a resident of Palm Beach County and employed as certified law enforcement officer law enforcement officer by **Defendant, PBSO. WHEELER,** is a "person" under 42 U.S.C. §1983 and at all times relevant to this case was acting under the direction and control of PBSO in such capacity as an agent, servant and employee of **PBSO**. **DEFENDANT WHEELER** participated in the unconstitutional violations and other wrongful acts that occurred in the morning hours of August 22, 2013 at which time he was within the course and scope of his employment under color of state law.

8. At all times material, hereto, **DEFENDANT McMAHON,** was/is a resident of Palm Beach County and employed as certified law enforcement officer law enforcement officer by **Defendant, PBSO. McMAHON,** is a "person" under 42 U.S.C. §1983 and at all times relevant to this case was acting under the direction and control of PBSO in such capacity as an agent, servant and employee of **PBSO**. **DEFENDANT McMAHON** participated in the unconstitutional violations and other wrongful acts that occurred in the morning hours of August 22, 2013 at which time he was within the course and scope of his employment under color of state law.

9. At all times material, hereto, **DEFENDANT BLANCO,** was/is a resident of Palm Beach County and employed as certified law enforcement officer law enforcement officer by **Defendant, PBSO. BLANCO,** is a "person" under 42 U.S.C. §1983 and at all times relevant to this case was acting under the direction and control of PBSO in such

capacity as an agent, servant and employee of **PBSO**. **DEFENDANT BLANCO** participated in the unconstitutional violations and other wrongful acts that occurred in the morning hours of August 22, 2013 at which time he was within the course and scope of his employment under color of state law.

10. At all times material**, Defendant ELTON BUTLER** was a civilian employee, was/is a resident of Palm Beach County, working as a licensed LPN, at the Gun Club Jail facility as a civilian employee.

**FACTUAL ALLEGATIONS PERTINENT TO ALL COUNTS**
**(Events that occurred on August 22, 2013)**
**COMMON PRACTICE FOR PBSO**

11. On a routine basis, the **PBSO** Deputy Sheriffs come into contact with non-threatening prisoners at the Gun Club Jail who suffer from medical and mental illnesses. Despite this contact, **Defendant PBSO** made no effort to adequately train and supervise said deputies. In order to adequately deal with the certainty of contact with non-threatening prisoners who suffer medical and mental illnesses, **PBSO** is charged with supplying a police force that is adequately trained and equipped to handle non-threatening individuals who suffer from medical and mental illnesses.

12. **PBSO** was required to keep DILLON safe and free from unnecessary physical injury or harm.

13. At all times material hereto, **PBSO** was aware that there needed to be effective supervisory and command structure in place to deal with the problem of responding to incidents with the medically and mentally ill at the Gun Club Jail. **PBSO** failed to provide adequate training and supervision of its deputies in the Palm Beach County jail when said deputies encounter the medically and mentally ill.

14. **PBSO** has maintained a custom of excessive force in executing arrests and the supervision of detainees by its sworn law enforcement officers. At all times material hereto, under **PBSO** General Order 500.01 for Use of Non-Deadly/Less Lethal Force, officers may use only the amount of force reasonably necessary to affect lawful objectives and can only escalate to the next level of force that is justified considering the amount of resistance given and the potential of injury of the subject by using that type of control.

15. **PBSO's** actions in this case and previous similar situations indicate a policy and custom of indifference to the rights of the medically and mentally ill and a failure to properly train and supervise their deputies in how to deal with individuals who suffer from medical illnesses. **PBSO's** refusal to train its deputies on how to interact with non-threatening individuals who suffer from medical and mental illnesses, and its failure to properly supervise those deputies has resulted in the infliction of excessive violence upon non-threatening individuals who suffer from medical and mental illnesses and the violation of their constitutional rights. **This lack of training and supervision causes these ill-trained and ill equipped deputies to ignore the medical conditions presented to them and resort to using excessive force as their only alternative.**

16. **PBSO** Deputies have increasingly used excessive force (in some cases deadly force) in situations where the use of such force was entirely unjustified and where the conduct of the officers created dangers that would otherwise have not existed and contributed to the claimed need to use force. Specifically, there have been an increasing and alarming number of similar incidents in which **PBSO** Deputies have physically assaulted members of the public, falsely arrested members of the public, and/or seriously injured or endangered the public by the intentional and/or negligent misconduct by

Deputies. Said serious incompetence or misbehavior has been general or widespread throughout the department. A review of the Internal Affair Investigations of these incidents shows a conscious disregard to the facts and circumstances surrounding each incident and a blanket justification of the actions of the deputies involved.

17. There has been a pattern of similar incidents in which citizens and those in custody were injured or endangered by the intentional and/or negligent misconduct of **PBSO** deputies revealing lack of proper training and intentional misconduct that is general and widespread throughout the **PBSO**.

18. Examples of the above referenced pattern of similar incidents of utilizing excessive force (in some cases deadly force) during interactions with non-threatening individuals who suffer from disabilities and/or medical and mental illnesses, which occurred prior to the incident alleged in this Complaint, are as follows:

a. On or about March 9, 2005, in Boca Raton, Florida, PBSO Deputies opened fire on a severely depressed and suicidal thirty-seven year old man with a gun to his head, after a **PBSO** Deputy stumbled startling other officers. **PBSO** took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons. The **PBSO** Deputies involved admitted that they had received little-to-no-training in the handling of suicidal subjects, and were not aware of **PBSO** having any crisis intervention team or department to handle suicidal persons.

b. On or about April 6, 2007, in Boynton Beach, Florida, PBSO Deputies utilized excessive force against a bipolar and severely medicated individual whose father

reported that he had locked himself in his room with a gun and was threatening to kill himself. Without calling out or identifying themselves, the PBSO Deputies ran into the room and fired two rounds into the individual despite no acts of provocation by the individual. Deputies then deployed their Taser into the individual as he lay bleeding on the floor. **PBSO** took no disciplinary action against the Deputies who inflicted this excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons.

c. On or about November 23, 2008, in Wellington, Florida, **PBSO** Deputies were in 5 to 10 mph pursuit of a woman with a known mental illness. Despite the fact that Deputies were fully aware of the woman's mental illness from dispatch having relayed conversations with the woman's daughter, **PBSO** Deputies forcibly rammed the suspect's vehicle into a ditch. **PBSO** Deputies then deployed canine units, forcibly removed the injured woman from her vehicle, slammed her to the ground, and forcibly handcuffed and placed her into a patrol car. **PBSO** took no disciplinary action against these Deputies who inflicted this excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

d. On or about December 1, 2008, in West Palm Beach, Florida, **PBSO** Deputies responded to a mother's call reporting that her son, a mentally unstable individual who was addicted to drugs, had taken her vehicle. Despite the fact that the individual had no history of violence and was unarmed, a team of **PBSO** Deputies surrounded the vehicle and unjustifiably used excessive force, including deadly force,

when they shot and killed the suspect when he refused to exit the vehicle. **PBSO** took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons.

e. On or about October 10, 2010, in West Palm Beach, Florida, **PBSO** Deputies responded to a mother's call reporting that her son, a severely mentally disabled individual, who suffers from Down Syndrome, and has been declared mentally incompetent by a panel of mental health professionals, had driven off in the family mini-van. The mother advised the Deputies of her son's resulting physical and mental handicaps and the fact that he had never driven a car prior to that evening. Despite the fact that the individual had no history of violence, was unarmed, and that the Deputies were well aware of the individual's mental and physical handicaps, a team of **PBSO** Deputies surrounded the vehicle and unjustifiably used excessive force when one of them discharged his firearm six (6) times from behind while the mini-van was moving away from the deputy striking the individual three (3) times; another **PBSO** Deputy performed a leg sweep maneuver, slammed him on the ground, and handcuffed him; and, another Deputy then aggressively and forcibly slammed the individual's head down into the pavement and held him down for over six (6) minutes. At no time did any of the deputies render first aid to the individual, despite the fact that he was bleeding excessively from gunshot wounds. **PBSO** took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with

mentally ill/handicapped persons. Notwithstanding this determination, **PBSO** conducted a training regarding the shooting this which was used as a case study. The case study ultimately determined that the deputies improperly boxed in the individual placing the deputies in a position where they were left with no decision but to improperly use deadly force. Notwithstanding this training case study, **PBSO** never provided any additional training or discipline to the deputies on scene and the Internal Affairs investigation was never updated.

19. Additional examples of the above referenced pattern of using excessive force (including tasing) on non-threatening persons who did not have known disabilities or illnesses that occurred prior to the incident alleged in this Complaint are as follows:

a. On or about April 22, 2007, in West Palm Beach, Florida, PBSO deputies utilized excessive force against a detainee. The deputies failed to report said use of excessive force. **PBSO** took no disciplinary action against these deputies who inflicted this excessive force, and **PBSO** failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

20. Further evidencing a pattern of similar incidents and Defendant **PBSO**'s awareness that its deputies are repeatedly being accused of violating constitutional rights for conduct similar to what occurred in the incident described above, examples of similar incidents that occurred prior to the incident alleged in this Complaint that also resulted in federal lawsuits alleging constitutional violations are as follows:

a. On or about December 25, 2008, in Belle Glade, Florida, a woman was pulled over by **PBSO** deputies for a simple traffic infraction. Without justification or reason, a **PBSO** deputy ordered this woman out of her car, placed her in a chokehold

position, slammed her body to the ground, and handcuffed her. The deputy then dragged the woman to a patrol car, forced her into the back seat, and repeatedly punched her in the face while she remained handcuffed. Contrary to all evidence on scene, the deputy reported that the woman violently resisted arrest and charged the woman with Resisting Officer with Violence, Corruption by Threat to a Public Servant, and Aggravated Assault. All of these charges were ultimately dropped by the State of Florida. Despite evidence supporting the unconstitutional excessive force of the deputies involved and the false arrest of the woman, PBSO took no disciplinary action against the deputy who inflicted this excessive force and caused this false arrest and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The woman brought a federal lawsuit against the deputy involved as well as the Palm Beach County Sherriff's Office in the United States District Court for the Southern District of Florida, CASE No.: 12-81381-CIV-ROSENBAUM/SELTZER. The woman brought counts of False Arrest against the deputy and **PBSO**, Negligent Hiring and Retention against **PBSO**, Excessive Use of Force in Violation of 42 U.S.C § 1983 against the deputy and **PBSO**, Violation of First Amendment Denial of Right to Free Speech against the deputy, and Violation of Initiation and Pursuit of Prosecution without Probable Cause against Bradshaw. The parties resolved this matter outside of court with terms of the settlement being reported by the Palm Beach Post and Sun Sentinel.

b. On or about November 14, 2010, in Pahokee, Florida, a neighbor was peacefully standing in his sister's front yard when he observed a traffic stop made by **PBSO** deputies. At the conclusion of the traffic stop, the deputies approached the neighbor, and without provocation or justification, grabbed him by the arms and waist,

and slammed him to the ground. The neighbor was then immediately handcuffed and brutally beaten by the deputies, to include vicious stomps to the neighbor's back, neck and head. Without any probable cause or justification, the deputies arrested the neighbor for Resisting Arrest without Violence and Disorderly Intoxication. The State of Florida entered a Nolle Prosse as to all charges against the neighbor. Despite evidence supporting the unconstitutional excessive force of the deputies involved, **PBSO** took no disciplinary action against the deputies who inflicted this excessive force and false arrest and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The neighbor brought a federal lawsuit against the deputies involved as well as the Palm Beach County Sherriff's Office in the United States District Court for the Southern District of Florida, CASE No.: 12-81204. The arrestee brought counts of False Arrest/False Imprisonment against the deputies and **PBSO**, Excessive Use of Force in Violation of 42 U.S.C § 1983 against the deputies and **PBSO**, Battery against the deputies and **PBSO**, and Negligence against the deputies and **PBSO**. This matter was dismissed by stipulation of the parties with unknown settlement terms.

c. On or about December 4, 2010, in West Palm Beach, Florida, **PBSO** deputies first, without justification or reason, deployed their taser on a mother's son who was sitting defenselessly and helplessly on the ground complying with requests of the deputies. Then, when the mother calmly objected, a deputy forcibly struck the mother in the forehead with the taser gun with such violence that it knocked the mother off her feet and lander her on her back and knocked her unconscious. The deputies then arrested the mother and charged her with Battery on a Law Enforcement Officer. The State of

Florida entered a Nolle Prosse on all criminal charges. Despite the fact that all non-Law Enforcement witnesses disclosed and confirmed that the mother had never committed any such battery and that they were in total shock and disbelief when the deputy struck the mother, **PBSO** took no disciplinary action against the deputy who inflicted this excessive force and caused this false arrest and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The woman brought a federal lawsuit against the deputy involved as well as the Palm Beach County Sherriff's Office in the United States District Court for the Southern District of Florida, CASE No.: 12-80439. The woman brought counts of Negligence and False Arrest against the deputy and **PBSO** resulting from allegations of unconstitutional excessive force and an illegal arrest. This matter was dismissed by stipulation of the parties with unknown settlement terms.

d. On or about December 2, 2011, in Lake Worth, Florida, **PBSO** deputies were escorting a handcuffed and fully compliant arrestee to their patrol car, when without justification, they forcibly slammed the arrestee into the patrol car, tasered the handcuffed arrestee in excess of seven times, kicked and punched the handcuffed and compliant arrestee, and forcibly struck him over the head with a flashlight causing the arrestee's head to split open. Despite video evidence supporting the unconstitutional excessive force of the deputy involved, **PBSO** took no disciplinary action against this officer who inflicted this excessive force and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The arrestee brought a federal lawsuit against the deputies involved as well as the Palm Beach County Sherriff's Office in the United States District Court for the Southern District

of Florida, CASE No.: 13-80979-CV-Middlebrooks/Brannon. The arrestee brought counts of Excessive Use of Force in Violation of 42 U.S.C § 1983 against the deputies and **PBSO**, Malicious Prosecution, and Negligent Retention against **PBSO**. The parties resolved this matter outside of court with terms of the settlement being reported by the Palm Beach Post and Sun Sentinel.

21. What is more, examples of the above referenced pattern of similar incidents that occurred after the incident alleged in this Complaint are as follow:

a. On or about October 4, 2012, in Boynton Beach, Florida, **PBSO** Deputies shot and killed an 18-year-old autistic and bipolar boy who had been involved in a domestic incident with his mother. The **PBSO** Deputy shot eleven (11) rounds at the unarmed autistic boy as he reached into his pants to grab lava rocks, fatally wounding him with a bullet to the heart. **PBSO** took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons. Additionally, Sheriff Bradshaw issued a statement supporting the Deputy stating “The deputy took the action he had to take.”

b. On or about November 6, 2012, in West Palm Beach, Florida, **PBSO** deputies approached a young black male who was sitting outside of his home. Without provocation or justification, the deputies and a West Palm Beach police officer went onto the young male’s property and cornered him. As the young male attempted to retreat into his house, the deputies and officer manhandled the young black male, lifted him up in the air, and body slammed him onto the pavement. The deputies then jumped on top of the

young male dropping their knees into the young male’s neck, back, and head. While the deputies pinned him down and placed him in handcuffs, a West Palm Beach officer punched the young male multiple times in the face. Despite the absence of any probable cause that the young male had committed any crime, the Deputies and Officers filed police reports and made statements that were contrary to the true facts at hand. Despite evidence and statements from the West Palm Beach Officer’s supporting the unconstitutional excessive force of the deputies involved, **PBSO** took no disciplinary action against the deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The young male brought a federal lawsuit against the main deputy involved as well as the Palm Beach County Sherriff’s Office in the United States District Court for the Southern District of Florida, CASE No.: 13-80996-CV-HURLEY/HOPKINS. The arrestee brought counts of Unreasonable Seizure and Excessive Use of Force in Violation of 42 U.S.C § 1983 against the deputy and **PBSO**, False Arrest/Imprisonment against the deputy and PBSO, and Negligent Retention against **PBSO**. The parties resolved this matter outside of court with terms of the settlement being reported by the Palm Beach Post and Sun Sentinel.

c. On or about January 14, 2014, in Palm Beach County, Florida, **PBSO** deputies struck an individual in the knees and head to gain compliance. Once on the ground, the deputies used five (5) drive stuns on the individual. **PBSO** took no disciplinary action against these deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

d. On or about April 4, 2014, in Boca Raton, Florida, **PBSO** Deputies encountered an individual suffering from mental health issues who had run out of his medication. The responding Deputy encountered the individual standing beside a vehicle and ordered him to remove his hands from his pockets. When the individual removed a screwdriver from his pocket, the **PBSO** Deputy fired his weapon and killed the individual. **PBSO** took no disciplinary action against the Deputy who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons.

e. On the morning of July 5, 2012, Chesnel Joseph a Palm Beach County resident and an recently diagnosed epileptic, was visiting with his sister and underwent a grand mal seizure. He was exhibiting all the signs of a grand mal seizure and his sister called 911 for medical help. PBSO deputies arrived and despite being told that Chesnel Joseph was an epileptic and “sick”, they then placed him under arrest for refusing to obey a command to get off of the floor after his grand mal seziure. When Chesnel Joseph did not respond to the shouts of the PBS deputy to get up Joseph was repeatedly tased and beaten and had to be taken to a local hospital. Thereafter, with the assistance of other deputies, a concocted a “made up” version of events which falsely ascribed various criminal acts committed by **JOSEPH** which resulted in two (2) felony charges being brought against **JOSEPH,** which charges were subsequently dismissed**.** A federal civil lawsuit was thereafter brought and settled out of court.

22. What is more, examples of the above referenced pattern of similar incidents that occurred at the Gun Club Jail facilities managed and overseen by PBSO Sheriff BRADSHAW, before the incident alleged in this Complaint are as follows:

a. On December 5, 2012, Alexis White was being held at the Gun Club Jail and was being escorted to her cell when she questioned to where she was being taken. For just asking a question, Ms. White was inexplicably attacked and was repeatedly punched in the head approximately ten to fifteen times, all for no reason by a PBSO corrections officer. After being repeatedly punched, another corrections officer came up and slammed her head into a wall. A lawsuit was filed in U.S. District court, being case # 9:13-cv-81263.

b. On or about April 13, 2008, Stuart Tucker, who was physically disabled from a variety of ailments, was arrested, and taken to the Gun Club Jail where he was repeatedly physically abused by the PBSO correctional officer. A civil lawsuit was filed in U.S. District court being case # 9:11-cv 80058.

23. In addition, Defendant WHEELER was well known to be physically abusive and known to falsify official records as it pertains to his conduct with prisoners housed at the Gun Club Jail facility. WHEELER was indicted in federal court in Case # 15-80050-CR MARRA in the US District Court for the southern district for a 2013 assault of another prisoner at the Gun Club Jail facility. WHEELER was also charged with falsifying his report about the incident.

24. In addition, PBSO deputy correctional officers were subjected to retaliation by fellow PBSO deputies/correctional officers for standing up for PBSO prisoners' rights, safety and welfare, as seen in the case of FEMMINELLA V PBSO, 40 2004 CA 9884

XXXX MB, when PBSO deputies went far out of their way to frame and have arrested a PBSO correctional officer and his wife for various made up felony offenses. A civil lawsuit was filed which resulted in a jury verdict for the violation of FEMMINELLA's rights.

25. Most of the enumerated similar incidents resulted in the filing of a complaint with **PBSO**' s Internal Affairs Department which ultimately cleared the deputy or deputies involved finding the deputy's or deputies' actions to be justified. Notwithstanding such a determination by Internal Affairs, a number of these similar incidents led to lawsuits which resulted in the payment of awards or settlements by **PBSO** and served to put **PBSO** on notice of the need for better policies, procedures, customs, trainings and practices and the numerous deficiencies in **PBSO**' s approach to the use of force, particularly in officer involved shootings and encounters with medically ill/handicapped persons.

26. **PBSO** has maintained a long-standing, widespread history of failure to train, supervise, or otherwise discipline its police officers for among other things, the use of excessive force, unlawful detentions, and the improper treatment of medically ill persons even though it had notice of this unlawful conduct by its employees and the public.

27. **PBSO** has maintained an internal system of review of complaints and incidents involving abuses of lawful authority such as the illegal use of force, unlawful detention, unlawful arrests, and the improper handling of incidents involving medically ill persons, by sworn law enforcement officers, which has failed to identify improper use of force by officers. As a result of **PBSO**' s failure to subject police officers who employed such acts to discipline, closer supervision, and/or retaining, it has become the de facto policy and custom of **PBSO** to tolerate such acts by its officers.

28. Despite all of these incidents**, PBSO** has repeatedly refused to ask for or allow any outside investigative agency to conduct any investigation into its deputies and allegations of violence and harm to the civilians of Palm Beach County Florida.

29. Instead, **PBSO** routinely performs cursory investigations of incidents involving extremely questionable use of excessive force (sometimes deadly force) on the part of **PBSO** Deputies, with an eye toward exonerating the Deputy involved rather than finding out the truth. Almost uniformly, investigating officers and supervisors uncritically endorse the Deputies' versions of events based solely upon the involved deputies' accounts of those events, even when those versions are incomplete, inconsistent, or are in direct contradiction of objective evidence. The result is that these incidents involving questionable use of force are not properly and impartially investigated, documented, or addressed with corrective measures where warranted.

30. Due to this intentionally inadequate investigative process, in virtually all excessive force incidents, **PBSO** has declared the conduct of its Deputies to be justified, particularly in those involving medically ill/handicapped individuals.

31. In fact, PBSO routinely files criminal charges against the persons they have harmed all in an effort to dissuade injured persons from seeking legal redress and to prevent the filing of civil liability claims, as was done in the instant case.

32. The foregoing acts, omissions, policies, or customs of **PBSO** caused law enforcement officers, including **CHASTINE, WHEELER, McMAHON and BLANCO**, to believe that acts such as the improper use of force, and the improper handling of incidents involving medically ill/handicapped persons would not be properly investigated. The consistent lack of accountability within **PBSO** for the questionable and often unjustifiable

use of deadly and/or excessive force has promoted an acceptance of disproportionate, aggressive, and unconstitutional behavior towards prisoners and others. The resulting culture of aggression both promotes and condones intimidating and harsh approaches toward the citizenry, with the excessive use of force as a frequent and foreseeable outcome.

33. Despite the notice and knowledge of **PBSO** as to the dangerous propensities of their sworn law enforcement officers because of said officers' lack of training, skill and/or experience, **PBSO** failed to implement any policies or programs to train said officers or otherwise intentionally failed to protect the public, including **TIMOTHY** from its danger.

34. The policies, customs, and practices complained of include, but are not limited to, the following:

a. Deliberate indifference by failing to adequately screen deputies and by failing to follow hiring protocols for sworn law enforcement officers;

b. Deliberate indifference by improperly training **PBSO** Deputies in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict harm upon persons being arrested and/or incarcerated;

c. Deliberate indifference by improperly training **PBSO** Deputies in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict harm upon mentally ill/handicapped persons they encounter;

d. Deliberate indifference in failing to properly supervise **PBSO** Deputies in their encounters with persons whom are incarcerated;

e. Deliberate indifference in failing to have Deputies properly reviewed for accurate use of force of incidents involving force used against arrested persons, incarcerated persons and mentally ill/handicapped persons, with conclusions frequently permitted to be drawn on the basis of clearly incorrect or contradictory information;

f. Deliberate indifference in failing to determine whether said employees, including **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO** posed a threat to DILLON and others as a result of their propensity to commit unlawful acts; and,

g. Deliberate indifference by retaining and failing to discipline employees even after a determination was made that said employees are a danger to the public.

35. PBSO was grossly and willfully negligent in the selection and/or training and/or supervision and/or retention of **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO**, as a sworn law enforcement officers of the **PBSO**, in that:

a. It failed to properly screen **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO** when they were hired as sworn law enforcement officers.

b. It failed to ensure that **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO** had undergone the required a) a Polygraph Examination or Voice Stress Analysis; b) a Psychological Examination; c) a Background Investigation; d) a Medical Examination; e) a Drug Screen; and, f) Receive the Sheriff's Approval.

c. It appointed **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO** as sworn law enforcement officers when it knew or, in the exercise of

reasonable care, should have known, of the disposition of **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO** to engage in such unlawful conduct.

d. Despite the fact that it knew or should have known that this pattern of conduct was being carried out by its agents and employees, **PBSO** has failed to and refused to:

i. Remove **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO** from their position as a sworn law enforcement officer;

ii. Take any disciplinary action against **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO**;

iii. Provide any retraining to **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO**: and,

iv. Provide redress for citizens, such as **TIMOTHY**, who have been injured thereby.

36. The actions of **DEFENDANTS CHASTINE, WHEELER, McMAHON and BLANCO** in this case, as well as the actions of **PBSO** in other similar situations, indicate that the individuals who violated **TIMOTHY's** rights in this case acted in accordance with **PBSO**'s policies and reflect policies that were adopted by **PBSO** and their high-ranking officials.

37. The failure of **PBSO** to competently investigate use of force incidents and encounters with medically ill/handicapped incarcerated persons, and to institute appropriate disciplinary and retraining action in the wake of them, serves to tacitly condone the egregious misconduct of the Deputies involved. The agency's inaction in this regard effectively annuls its official general orders regarding the use of force and

substitutes in their place a permissive de facto policy and custom of tolerating excessive force, which will invariable have the effect of promoting similar misconduct by other deputies in the future. In sum, the pattern and practice of the excessive use of force on the part of **PBSO** Deputies stems from systemic deficiencies in training and supervision and from the inadequate investigation and routine ratification of deadly and excessive force.

38. The incident reports prepared by **DEFENDANTS CHASTINE, WHEELER, McMAHON, and BLANCO** for submission to the Palm Beach County prosecuting authorities contained false statements and/or material omissions. These police reports that included a fabricated chain of events was the result of the collusion of the deputies involved as they purposely omitted that they were told and/or should have known at the outset that **TIMOTHY** was heavily sedated from the combination of sedating drugs being administered to **TIMOTHY** by the Palm Beach County Jail.

39. The conduct of **DEFENDANTS CHASTINE, WHEELER, McMAHON, and BLANCO** occurred under the color of state law.

40. Due to the deputies lack of fear that any of their colleagues would find their actions improper and report them for improper conduct and the lack of discipline or consequences towards those who wantonly violated **TIMOTHY'**s rights, it is clear that the actions of **DEFENDANTS CHASTINE, WHEELER, McMAHON, and BLANCO** reflect a custom, policy, and practice of Defendant PBSO.

41. Taking Plaintiff's allegations as true, since none of the deputies reported anything improper or unusual to their superiors, it is crystal clear that all PBSO deputies who came onto the scene consider the violation of rights and inflicting violence upon non-

threatening and disabled individuals to be standard procedure and consistent with the policy custom and practice and training of the PBSO.

42. Defendant, PBSO's failure to implement and train its deputies as to proper policies, practices, customs, and usages regarding the interaction of its deputies with persons whom are medically ill and/or suffer from disabilities, was the reason behind the use of force and proximately caused Plaintiff, **TIMOTHY’**s suffering.

43. Defendant, PBSO, failed to adequately train and supervise its deputies to properly manage interactions with persons who are medically ill and/or suffer from disabilities, including those whom are heavily sedated during incarceration by their own jail system, in order to minimize the use of force during such interactions.

44. At all times, relevant to this case it was foreseeable that Defendant, **PBSO’s** deputies would, as part of their normal duties, encounter disabled, ill and overly medicated persons such as **TIMOTHY.**

45. By failing to adequately train and supervise officers to properly manage interactions with individuals who have been heavily sedated during incarceration, with multiple medications, who may be ill and/or disabled, the Defendants all acted with deliberate indifference to the health, safety and rights of these citizens, including **TIMOTHY**. The failure to train and supervise officers to properly manage interactions with heavily sedated incarcerated individuals, was a moving force behind the excessive force used on **TIMOTHY** and proximately caused his suffering.

46. DEFENDANT PBSO has a policy, practice and custom of failing to supervise deputies to reduce excessive force, and failing to train deputies to resolve encounters with disabled and medically ill citizens, including those who suffer from being

overly sedated while incarcerated, without using excessive force. Defendant has been on notice that this policy is inadequate and needed significant changes to its policy, training, and supervision concerning the use of force. That policy, practice and custom was the moving force behind the excessive force used against **TIMOTHY** and proximately caused his suffering.

47. Defendant **PBSO** has a policy, practice and custom of failing to adequately investigate and discipline police officers who use excessive force on disabled citizens and citizens suffering from medical conditions, including the helpless, overly sedated inmates. This policy, practice and custom was another moving force behind the excessive force used against **TIMOTHY** and proximately led to and caused his suffering.

48. These policies, practices, and customs directly and proximately resulted in physical harm of **TIMOTHY**, a nonviolent, overly sedated, hand-cuffed prisoner.

49. **DEFENDANTS CHASTINE, WHEELER, McMAHON, BLANCO** and **PBSO**, have demonstrated a pattern or practice of excessive force which is both reflected by and stems from its failure to adequately review and investigate deputies' uses of force, fully and objectively investigate all allegations of police misconduct, identify and respond to patterns of at-risk behavior, provide its deputies with the support, training, supervision, and equipment needed to allow them to do their jobs safely and effectively, adopt and enforce appropriate policies, and implement effective community policing strategies at all levels of the PBSO.

50. At all relevant times herein, Palm Beach County acted under color of law and pursuant to certain customs, policies, and practices that were the moving force behind the constitutional violations asserted herein.

**JURISDICTION AND VENUE**

51. This Court has jurisdiction over the claims raised in this Complaint under 42 U.S.C. § 1983 and 1988, and 28 U.S.C. §133 1.

52. Venue is appropriate in the Southern District of Florida Under 28 U.S.C. § 1391 as Defendants reside, and the acts complained of arose, in the Southern District of Florida.

53. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent claims arising under the laws of the State of Florida.

54. The amount in controversy exceeds $75,000 exclusive of interest and costs.

55. Upon information and belief, despite any official policies that may be in writing, Palm Beach County has had actual knowledge of and has permitted and condoned a custom or practice of using excessive force against inmates and detainees in the Palm Beach County jail since at least 2004 and continuing to at least the present time.

56. The present case arises from PBSO's continued implementation of improper and illegal policies, customs, and practices that cause severe injuries including those injuries suffered by Timothy Dillon.

57. At all times relevant to this cause, PBSO was required to train its detention employees on the use of appropriate force on persons in custody to keep them safe from physical or psychological injury or harm.

58. On or about September 3, 2016, and at all times relevant to this matter PBSO was required to keep DILLON safe and free from unnecessary physical and psychological injury or harm PBSO was also required to provide DILLON with appropriate medical care if he suffered physical and psychological injury or harm while in Palm Beach County's custody.

59. The injuries to DILLON were caused, in part, by PBSO employees, including Defendants **CHASTINE, McMAHON, WHEELER, and BLANCO** through a condition or use of tangible personal property.

60. On or about August 22, 2013, the unnecessary and excessive beating was digitally recorded by the Palm Beach County Jail's, high-definition surveillance video cameras, but with no sound.

61. The video of the beating shows the named Defendants and others encouraging or supporting the County-sponsored mob like violence within the Palm Beach County Jail. The most brutal violence was meted out by Defendants **CHASTINE, WHEELER, BLANCO, and McMAHON**.

62. The video shows that, toward the end of the beating, one of the Palm Beach County Deputies looking up at the surveillance camera and realizing in a stunned look that the surveillance video camera system was recording the beating.

63. On or about August 22, 2013, following the beating, PBSO deputies took a near dead TIMOTHY DILLON to the emergency department at Wellington Regional Hospital where, due to his respiratory failure, he was placed on a ventilator

64. On or about September 15, 20I3, Palm Beach County detention employees returned a neurologically impaired TIMOTHY DILLON to the Palm Beach County jail general population.

65. Upon information and belief, on or about August 24, 2016, Palm Beach County Sheriff Ric Bradshaw and other Palm Beach County policy makers viewed the video recording of the beating.

66. Upon information and belief, on or about November 14, 2013, at the request of Sheriff Ric Bradshaw and/or other Palm Beach County Sheriff Office personnel, the Palm Beach County District Attorney filed 3rd degree felony charges against TIMOTHY DILLON for resisting and violently assaulting CHASTINE. Those felony charges are still pending.

67. Upon information and belief, after August 24, 2013 Palm Beach County Sheriff's Office Internal Affairs Division began an investigation of the incident that included analyzing the beating video and questioning the Palm Beach County employees involved.

68. At all times material to this cause, Sheriff Bradshaw was one of the policymakers for the Palm Beach County Jail.

69. DILLON has exhausted all administrative remedies and/or they were not available to him as on or about November 7, 2013, DILLON was released on bond from the Palm Beach County Jail.

70. Each of the Defendants caused, and is responsible for, the unlawful conduct described herein, and resulting injuries by, among other things, personally participating in the unlawful conduct, acts or omissions, or acting jointly

with the others who did so; by authorizing, acquiescing in or setting into motion policies, practices, plans or actions that led to the unlawful conduct; by failing and refusing with deliberate indifference to TIMOTHY Dillon's rights by ratifying the unlawful conduct that occurred under their discretion and control, including failing to take remedial or disciplinary action.

71. The Defendant deputies and PBSO each acted under color of law.

72. The Defendants each deprived TIMOTHY DILLON of his constitutional rights, including his right to be free from excessive and unreasonable force in violation of the Fourteenth Amendment and pursuant to 42 U.S.C. § 1983.

73. Defendants were deliberately indifferent to protecting TIMOTHY DILLON from harm and failed to prevent said harm, further failed to provide urgently needed medical care and their conduct was unreasonable in failing to protect TIMOTHY DILLON from near death and harm.

74. The beating has caused TIMOTHY DILLON to suffer not only physically, but also mentally and emotionally. The injuries have prevented DILLON from returning to work and he has suffered economic losses as a result.

**COUNT I**
**Defendant Ric Bradshaw, Sheriff, Palm Beach County –**
**§§1983 and *1988/Monnell* Policy Claim**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

75. PBSO's actions, which resulted in Dillon's injures, were committed pursuant to one or more interrelated *de facto,* as well as explicit, policies, uses, practices and/or customs of the PBSO regarding use of excessive force and withholding medical care in the jail.

76. PBSO, acting at the level of official policy, practice, and custom , with deliberate, callous, conscious and unreasonable indifference to DILLONS constitutional rights, authorized, tolerated, and institutionalized the custom and practice of using excessive force on jail detainees and providing inadequate medical care to those who it harms. It also ratified, condoned and/or encouraged this illegal conduct.

77. PBSO knew of its illegal policy, pattern, custom and/or practice of administering excessive force and providing inadequate medical care as far back as 2004. The policies, customs, patterns and practices continued in this case, as evidenced by the video of the assault on DILLON.

78. The video of the beating shows about a ten (10) variously classified PBSO detention employees actively involved in the unnecessary beating and near death of DILLON. Participation in this large number without any objection or attempt to quash the beating by any PBSO employee, shows that PBSO consciously and deliberately engaged in long- standing custom, pattern and practice of using excessive force on detainees.

79. PBSO owed DILLON a duty to supervise, train, and direct its jail detention employees in appropriate, humane methods of detention and restraint and provision of medical services. PBSO could not delegate this duty someone else. For purposes of Plaintiffs Section 1983 and 1988 claims, PBSO's policymakers promulgated policies and procedures that encouraged its employees to - or failed to discourage its employees from employing "unnecessary application

of force" (a.k.a. excessive force) against pretrial detainees, causing serious injuries and refusing or failing to remedy those conditions.

80. PBSO's policy, practice and/or custom of using excessive force provided the moving force that caused DILLON's injuries and damages. Absent these policies, practices, and/or customs, PBSO employees would not have utilized the unnecessary excessive force that severely injured DILLON

81. On information and belief, the PBSO employees, including Defendant WILLIAM WHEELER, who caused or contributed to cause DILLON's injuries had previously exhibited a tendency to employ excessive force against detainees. WHEELER was indicted by on federal charges on April 15, 2015 for beating a Gun Club Jail prisoner and for falsification of official jail records. PBSO knew of those tendencies and intentionally refused to take reasonable action to prevent such conduct from occurring at the Gun Club Jail.

82. PBSO's policies, customs, practices , and conditions described in this Complaint provided the moving force for and caused DILLON's injuries.

83. The foregoing policies, practices, customs and omissions, maintained by PBSO violated TIMOTHY DILLON' s constitutional rights, including but not limited to those granted by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 .

**COUNT II**
**Defendant LAVONTE CHASTINE, Individually- 42 U.S.C. §§ 1983 and 1988**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

84. On August 22, 2013, at all times material to this cause, Defendant LAVONTE CHASTINE acted under color of law in his interaction with DILLON.

85. On August 22, 2013, while acting under color of law, Defendant LAVONTE CHASTINE intentionally, willfully, wantonly and unreasonably used excessive force to inflict physical and mental injuries on DILLON, which deprived DILLON of his rights, privileges, and immunities secured by the U.S. Constitution and 42 U.S.C. §§ I 983 and 1988.

86. Defendant LAVONTE CHASTINE's acts and omissions demonstrated a deliberate indifference to and conscious disregard for DILLON 's constitutional rights and safety.

87. Defendant LAVONTE CHASTINE's acts and omissions were a proximate cause of DILLON's injuries and damages.

**COUNT III**
**Defendant LAVONTE CHASTINE, Individually - Negligence/Assault**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

88. On August 22, 2013, Defendant LAVONTE CHASTINE owed a legal duty to not physical or mentally harm DILLON. Defendant LAVONTE CHASTINE breached that duty by using excessive force against DILLON in the beating at the Palm Beach County jail. DILLON suffered physical and mental injures and damages as a proximate result of the breach. Consequently, Defendant LAVONTE CHASTINE's conduct constitutes negligence.

89. On August 22, 2013, Defendant LAVONTE CHASTINE' s conduct, which when viewed objectively from his standpoint at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of

the potential harm to others. Defendant LAVONTE CHASTINE had actual, subjective awareness of the risk involved, but neve11heless proceeded with conscious indifference to the rights, safety or welfare of others, including Ba11ee. Consequently, Defendant LAVONTE CHASTINE's conduct constitutes gross negligence. Such gross negligence was a proximate cause of the occurrence and TIMOTHY's injuries and damages.

**COUNT IV**
**Defendant GEORGE McMAHON, Individually - 42 U.S.C. § 1983**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

90. On August 22, 2013, at all times material to this cause, Defendant GEORGE McMAHON acted under color of law.

91. On August 22, 2013, while acting under color of law, Defendant GEORGE McMAHON intentionally, willfully, wantonly and unreasonably used excessive force to inflict physical and mental injuries on DILLON, which deprived DILLON of his rights, privileges, and immunities secured by the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

92. Defendant GEORGE McMAHON ' s acts and omissions demonstrated a deliberate indifference to and conscious disregard for DILLON' s constitutional rights and safety.

93. Defendant GEORGE McMAHON's acts and omissions were a proximate cause of Dillon's injuries and damages.

**COUNT V**
**Defendant GEORGE McMAHON, Individually -Negligence/Assault**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

94. On August 22, 2013, Defendant GEORGE McMAHON owed a legal duty to not physical or mentally harm DILLON. Defendant GEORGE McMAHON breached that duty by using excessive force against DILLON in the beating at the Palm Beach County jail. DILLON suffered physical and mental injuries and damages as a proximate result of the breach. Consequently, Defendant, GEORGE McMAHON's conduct constitutes negligence.

95. On August 22, 2013, Defendant GEORGE McMAHON's conduct, which when viewed objectively from his standpoint at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendant GEORGE McMAHON had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including DILLON. Consequently, Defendant GEORGE McMAHON's conduct constitutes gross negligence. Such gross negligence was approximate cause of the occurrence and Dillon's injuries and damages.

**COUNT VI**
**Defendant WILLIAM WHEELER, Individually - 42 U.S.C. §§ 1983 and 1988**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

96. On August 22, 2013 at all times material to this cause, Defendant WILLIAM WHEELER acted under color of law.

97. On August 22, 2013, while acting under color of law, Defendant WILLIAM WHEELER intentionally, willfully, wantonly and unreasonably used excessive force to inflict physical and mental injuries on DILLON, which deprived

DILLON of his rights, privileges, and immunities secured by the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

98. Defendant WILLIAM WHEELER's acts and omissions demonstrated a deliberate indifference to and conscious disregard for DILLON's constitutional rights and safety.

99. Defendant WILLIAM WHEELER's acts and omissions were a proximate cause of DILLON's injuries and damages.

**COUNT VII**
**Defendant WILLIAM WHEELER, Individually - Negligence/Assault**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

100. On August 22, 2013, Defendant WILLIAM WHEELER owed a legal duty to not physical or mentally harm DILLON. Defendant WILLIAM WHEELER breached that duty by using excessive force against DILLON in the beating at the Palm Beach County Gun Club Jail. DILLON suffered physical and mental injuries and damages as a proximate result of the breach. Consequently, Defendant WILLIAM WHEELER's conduct constitutes negligence.

101. On August 22, 2013, Defendant WILLIAM WHEELER's conduct, which when viewed objectively from his standpoint at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendant WILLIAM WHEELER had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including DILLON. Consequently, Defendant WILLIAM WHEELER's conduct constitutes gross

negligence. Such gross negligence was a proximate cause of the occurrence and DILLON's injuries and damages.

**COUNT VIII**
**Defendant SAMUEL BLANCO, Individually - 42 U.S.C. §§ 1983 and 1988**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

102. On August 22, 2013 at all times material to this cause, Defendant SAMUEL BLANCO acted under color of law.

103. On August 22, 2013, while acting under color of law, Defendant SAMUEL BLANCO intentionally, willfully, wantonly and unreasonably used excessive force to inflict physical and mental injuries on DILLON, which deprived DILLON of his rights, privileges, and immunities secured by the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.

104. Defendant SAMUEL BLANCO'S acts and omissions demonstrated a deliberate indifference to and conscious disregard for DILLON's constitutional rights and safety.

105. Defendant SAMUEL BLANCO'S acts and omissions were a proximate cause of DILLON's injuries and damages.

**COUNT IX**
**Defendant SAMUEL BLANCO, Individually - Negligence/Assault**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

106. On August 22, 2013, Defendant SAMUEL BLANCO owed a legal duty to not physical or mentally harm DILLON. Defendant SAMUEL BLANCO breached that duty by using excessive force against DILLON in the beating at the Palm Beach County jail. DILLON suffered physical and mental injuries and damages as a proximate

result of the breach. Consequently, Defendant SAMUEL BLANCO'S conduct constitutes negligence.

107. On August 22, 2013, Defendant SAMUEL BLANCO'S conduct, which when viewed objectively from his standpoint at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendant SAMUEL BLANCO had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including DILLON. Consequently, Defendant SAMUEL BLANCO'S conduct constitutes gross negligence. Such gross negligence was a proximate cause of the occurrence and DILLON's injuries and damages.

**COUNT X**
**<u>DEFENDANT ELTON BUTLER, Individually - Negligence/Assault</u>**

Plaintiff re-alleges and incorporates the Introduction and paragraphs 1-74.

108. On August 22, 2013, Defendant ELTON BUTLER owed a legal duty to not physical or mentally harm TIMOTHY. By reasons of his training and education BUTLER knew or should have none that the aforesaid actions of CHASTINE, WHEELER, McMAHON and BLANCO would cause serious bodily harm to TIMOTHY and lead to his inability to breath and death. In fact, BUTLER was able to see firsthand TIMOTHYs inability to breathe and watched him struggle to inhale. BUTLER had a duty to intervene and try to stop the physical abuse before it lead to serious bodily harm.

109. Defendant BUTLER breached that duty by using excessive force against TIMOTHY in the beating at the Palm Beach County jail. TIMOTHY suffered physical and mental injuries and damages as a proximate result of the breach. Consequently,

Defendant BUTLER'S conduct constitutes negligence. On August 22, 2013, Defendant BUTLER'S conduct, which when viewed objectively from his standpoint at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to TIMOTHY. Defendant BUTLER had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of TIMOTHY. Consequently, Defendant BUTLER'S conduct constitutes gross negligence. Such gross negligence was a proximate cause of the occurrence and TIMOTHY's injuries and damages.

## DAMAGES

110. Defendants are jointly and severally liable for the wrongs complained of herein, either by virtue of direct participation or by virtue of encouraging, aiding, abetting, com mitting, and/or ratifying and condoning the commission of the above described acts and/or omissions.

111. Plaintiff TIMOTHY DILLON, suffered compensatory, special, and punitive damages for the following:

a. Extreme mental anguish and emotional distress as a result of being physically assaulted and battered by Defendants;

b. Extreme physical abuse, mental anguish and emotional distress as a result of Defendants' improper conduct;

c. Violation of Plaintiffs civil rights by Defendants; and,

d. Punitive damages for egregious acts and omissions of the individual Defendants only.

112. Plaintiff is entitled to attorney' s fees for litigation of this matter.

113. Plaintiff requests and is entitled to a trial by jury.

## PRAYER FOR RELIEF

Plaintiff **TIMOTHY DILLON**, prays that for judgment on his behalf and against all Defendants jointly, severally, and *in solido,* as follows:

a. Compensatory and special damages;

b. Punitive damages as to the individual Defendants only;

c. The cost of this action and reasonable attorney fees as provided by 42 U.S.C. §§ 1983 and 1988;

d. Judicial interest;

e. Trial by jury; and,

f. Such further relief as this Court deems just and equitable.

**LAW OFFICE OF GARY E. SUSSER, P.A.**
*Attorney for Plaintiff*
2755 S. Federal Highway, Suite 13
Boynton Beach, FL 33435
561-735-4636 (Courtdocs@susserlaw.com)

***/S/ Gary E. Susser, Esq.***
By: ______________________________
GARY E. SUSSER, ESQ.
FBN: 622710